## AFFIDAVIT OF DAVID M. DITULLIO

I, David M. DiTullio, being duly sworn, depose and state as follows:

### AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and, as such, am an "investigative or law enforcement officer of the United States," within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I have been employed as an Agent with the DEA since August 2000 and have received extensive training in narcotics enforcement.  I attended the DEA Academy at Quantico, Virginia for sixteen weeks and have participated in numerous narcotics investigations in both surface and undercover capacities.  I have investigated all aspects of narcotics organizations, from street-level distributors to large-scale traffickers. In the course of drug trafficking investigations (both diverted pharmaceuticals and other types of controlled substances), I have conducted physical surveillance, used electronic and video surveillance, purchased drugs in an undercover capacity, interviewed and operated informants and cooperating witnesses, reviewed consensually recorded conversations and meetings, executed search and arrest warrants, and arrested and interviewed subjects. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers operate.

### PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of applications for criminal complaints and arrest warrants charging Antonio Amauris Rosario GARCIA a/k/a "Animal" (born 1982), John ROBLES (born 1965), Jector TORRES (born 1989) and Cintia FRANCO (born 1989)

with conspiracy to possess with intent to distribute and to distribute fentanyl, in violation of 21 U.S.C. § 846 (the "Subject Offense").  Based on the facts presented in this affidavit, there is probable cause to believe that GARCIA, ROBLES, TORRES, and FRANCO conspired with each other, and with others both presently known and unknown, to commit the Subject Offense.

4.     The facts in this affidavit come from my participation in this investigation, my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses.  This affidavit includes only those facts I believe are necessary to establish probable cause for the issuance of the requested complaints and arrest warrants and does not include all of the facts uncovered during the investigation.

<u>RELEVANT STATUTES</u>

5.     Title 21, United States Code, Section 846 makes it unlawful for any person to conspire with another to possess with the intent to distribute, or to distribute, a controlled substance.

6.     Title 21, United States Code, Section 812 identifies N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, as a Schedule II controlled substance.

<u>INVESTIGATON OF GARCIA AND ASSOCIATES</u>

7.     In February 2019, law enforcement agents from the DEA began an investigation into the sale of fentanyl, being sold as purported oxycodone pills, by John ROBLES.  ROBLES owns and/operates Albino's Market, a small convenience store located at 90 and 94 Belmont Street in Worcester, Massachusetts.

8.     Agents[1] determined that ROBLES was using an AT&T Wireless cell phone assigned call number (508) 847-1077 ("Target Telephone 1").  On June 26, 2019, the United States District Court (Hillman, J.) authorized the interception of wire and electronic communications involving Target Telephone 1 for a thirty-day period.  Docket No. 19-mc-94023-TSH.  The District Court renewed that authorization for additional thirty-day periods on July 31, 2019 and August 29, 2019.

9.     The investigation revealed that GARCIA was supplying ROBLES with fentanyl.  Agents also determined that GARCIA was using an AT&T cell phone assigned call number (917) 331-7948 ("Target Telephone 2").  On July 31, 2019, the District Court (Hillman, J.) authorized the interception of wire and electronic communications involving Target Telephone 2 for a thirty-day period.  Docket No. 19-mc-94027-TSH.  The District Court extended that authorization for an additional thirty-day period on August 29, 2019.

10.     The investigation further revealed that GARCIA conspired with several individuals – including ROBLES, FRANCO, and TORRES – to possess with intent to distribute and to distribute fentanyl.  Specifically, the investigation has revealed that GARCIA would obtain fentanyl and provide that fentanyl to ROBLES, FRANCO, and TORRES for further distribution.

11.     Evidence of this conspiracy includes interceptions of communications involving Target Telephone 1 and Target Telephone 2.  Unless otherwise noted, ROBLES used Target Telephone 1 for all of the intercepted communications referenced herein.  Further,

---

[1] Unless otherwise noted, the term "agents" is intended to refer to DEA special agents, DEA task force officers, Worcester Police detectives and other law enforcement officers participating in this investigation.

unless otherwise noted, GARCIA used Target Telephone 2 for all of the intercepted communications referenced herein.

A.  Relationship between GARCIA and FRANCO

12.    Records from the Massachusetts Registry of Motor Vehicles, intercepted communications, and surveillance in this investigation have revealed that GARCIA and FRANCO reside at 8 Reeves Street, Apartment 3 in Worcester, Massachusetts with their infant child.

13.    Throughout this investigation, agents have observed GARCIA and FRANCO primarily use two vehicles, both of which are registered to FRANCO at 8 Reeves Street:  a red Jeep Grand Cherokee bearing Massachusetts registration 31Y220 (hereinafter the "Jeep"); and a blue 2010 Toyota Prius bearing Massachusetts registration 9JP916 (hereinafter the "Prius").

14.    The booking report for GARCIA's November 8, 2018, arrest by the Clinton, Massachusetts Police department for a violation of Massachusetts General Laws c.90 s10, Unlicensed Operation of a Motor Vehicle, lists his spouse as "Cinthia Franco" (sic). Although GARCIA frequently refers to FRANCO as his "wife" in intercepted calls, agents believe that they are not legally married. In other intercepted calls, GARCIA has spoken of divorce proceedings from a different woman in New York.[3]

## STATEMENT OF PROBABLE CAUSE

---

[3] Even if FRANCO and GARCIA were legally married, no marital communications privilege would shield their communications in this case.  Communications concerning crimes in which the spouses are jointly participating do not fall within the protection of the marital communications privilege. United States v. Picciandra, 788 F.2d 39, 43 (1st Cir. 1986) *cert. denied,* 479 U.S. 847, 107 S.Ct. 166, 93 L.Ed.2d 104, *rehearing denied,* 479 U.S. 978, 107 S.Ct. 481, 93 L.Ed.2d 425 (1986)

15.     This investigation was conducted using a cooperating witness ("CW-1"), who has provided information concerning the drug distribution activities of ROBLES to the DEA and Worcester Police since February 2019.[4]

16.     The DEA made approximately fourteen controlled purchases of pills from ROBLES.  During each controlled buy from ROBLES, CW-1 received a quantity of round blue pills marked with an "M" on one side and "30" on the opposite side, similar in size, appearance and markings to pharmaceutical grade 30mg oxycodone pills.  A representative sample of these pills have been analyzed by a DEA laboratory and found to contain fentanyl. In my training and experience, illicit drug trafficking organizations often clandestinely manufacture pills containing a mixture of fentanyl and other substances to mimic pharmaceutical grade opiate painkillers.

A.     June 27, 2019 Distribution of fentanyl pills by ROBLES and GARCIA

17.     On June 27, 2019, at approximately 1:22 p.m., CW-1 called ROBLES to order 200 "empanadas," i.e. 200 purported oxycodone pills that actually contained fentanyl.[5]  CW-1 stated that he would be arriving at the store, Albino's Market, in about an hour and a half.  ROBLES told him to "head over."

---

[4] The identity of CW-1 is known to agents.  CW-1 has a criminal history that includes state court convictions for drug offenses.  CW-1 has received monetary consideration in exchange for cooperation on this investigation.  Agents have corroborated information provided by CW-1 during the investigation by reviewing all available audio and video recordings made during the course of the controlled buys as well as interceptions of calls over Target Telephones 1 and 2.  I consider the information provided by CW-1 to be reliable.

[5] Throughout this investigation, ROBLES referred to the fentanyl pills using various food names, frequently "empanadillas" and "pastelillos."  Based upon my training and experience, I am aware that drug dealers often use brief, non-descriptive, cryptic and ambiguous language to refer to narcotics and money during conversations over the telephones.

18.     Approximately 20 seconds after ending his call with CW-1, at approximately 1:24 p.m., ROBLES called GARCIA and stated, "what I talked to you about yesterday, bring it over."

19.     At approximately 3:09 p.m., ROBLES sent a text message to GARCIA that read, "Come on please." At approximately 3:10 p.m., GARCIA responded by text message, saying "10 I arrive."

20.     Agents met with CW-1 in preparation for the purchase, and searched CW-1 and his vehicle for drugs and excess money with negative results. Agents then provided CW-1with $4,400 in cash and a monitoring/recording device. At approximately 3:08 p.m., agents followed CW-1 as he drove to the area of Albino's Market, arriving at approximately 3:17 p.m.

21.     At approximately 3:18 p.m., ROBLES sent a text message to GARCIA that read "I have my friend here." At approximately 3:29 p.m., ROBLES again texted GARCIA to ask "How much longer." At approximately 3:39 p.m., GARCIA called ROBLES and said "I'll be there, I'm already on the way."

22.     Agents conducted surveillance outside of GARCIA's residence at 8 Reeves Street, Worcester. At approximately 3:41p.m., agents observed GARCIA depart, driving the Jeep. Based on a comparison with her MA driver's license photograph, agents believe FRANCO was the front seat passenger in the Jeep. A baby was in the back seat.

23.     Agents conducting surveillance in the area of Albino's Market observed the Jeep pulling out of a parking spot on Belmont Street in front of Albino's Market at approximately 3:53 p.m. GARCIA was in the driver's seat of the Jeep.

24.     Agents observed CW-1 walk in and out of Albino's Market several times between his arrival at approximately 3:17 p.m. and departure at approximately 3:57 p.m. At one point, CW-1 called agents to report that ROBLES was waiting for the pills. After leaving Albino's Market, CW-1 drove directly to a prearranged meeting spot, where he provided agents with 200 pills that he had purchased from ROBLES as well as $200 in cash.[6]

25.     According to CW-1, when he first entered the store, he gave ROBLES $4,200 for the 200 pills he had arranged to buy.  ROBLES informed CW-1 that he was waiting for someone to arrive with the pills.  ROBLES told CW-1 that he would reduce the price further to $20/pill if CW-1 purchased 300 pills.  CW-1 walked in and out of the store several times, waiting for the pills.  CW-1 stated that he saw a man arrive in a red Jeep and walk into the store.  CW-1 could not see the male when he was inside the store, but observed him leave moments later carrying a juice.  Immediately after that man exited the store, ROBLES called CW-1 back into the store and provided CW-1 with a Styrofoam to-go container that had two plastic baggies, each containing approximately 100 pills.

B.     Augsut 2, 2019 Controlled Purchase of Fentanyl

---

[6] ROBLES had not specified the price per pill prior to the June 27, 2019 sale.  Agents provided CW-1 with sufficient cash to pay $22/pill, the price CW-1 had previously paid when he purchased 100 pills. ROBLES charged CW-1 a reduced price of $21/pill because the quantity purchased was increased to 200.

26.     On July 31, 2019, CW-1 placed a recorded call to ROBLES.[7]  In summary, CW-1 requested to purchase "200," referring to fentanyl pills.  ROBLES and CW-1 agreed that CW-1 would meet ROBLES at Albino's Market on August 2, 2019 to make the purchase.

27.     On August 2, 2019, at approximately 10:08 a.m., GARCIA placed a phone call to ROBLES.  During the ensuing conversation, ROBLES asked GARCIA, "Are you coming by later?  GARCIA responded, "Yeah, I'll be dropping by."

28.     At approximately 11:37 a.m., ROBLES called GARCIA and asked, "What's up? This guy is about to arrive."  GARCIA responded by saying, "In like 10 minutes I will swing by there."

29.     On August 2, 2019, at approximately 12:28 p.m., agents intercepted another call between ROBLES and GARCIA during which GARCIA asked, "How many boxes did you say?"  ROBLES responded, "Uh…what I told you, 200 empanadillas."  As noted in footnote 4 above, I believe that ROBLES was referring to the fentanyl pills when he referenced "empanadillas."

30.     At approximately 12:30 p.m., agents met with CW-1 in preparation for the controlled buy.  Agents searched CW-1 and his vehicle for drugs and excess currency with negative results, then provided CW-1 with a recording device and $4,000.  Agents followed CW-1 from a predetermined location and observed him park near Albino's Market at approximately approximately12:36 p.m.  Agents observed ROBLES greet CW-1on the sidewalk outside the market door.  After a short period of time, the two entered the market.

---

[7] This call was consensually recorded by CW-1, as the interception of Target Telephone 1 pursuant to the Court's July 31, 2019 order was not effective until August 1, 2019.  I monitored the call, which was conducted in Spanish.  A formal translation of that call is not yet available.

8

31.    Agents also conducted surveillance at 8 Reeves Street Worcester, the residence of GARCIA and FRANCO, earlier that morning.  Agents observed two vehicles parked in the driveway: the Jeep and a blue 2010 Toyota Prius bearing Massachusetts registration 9JP916 (hereinafter the "Prius"), which was also registered to FRANCO.

32.    At approximately 12:37 p.m., a surveillance agent observed the Prius back out of the driveway of 8 Reeves Street and drive away.  Surveillance units followed the Prius directly to the area of Albino's Market.  A surveillance agent observed that FRANCO operated the Subject Vehicle and GARCIA was the front seat passenger.

33.    At approximately 12:43 p.m., a surveillance agent observed the Prius park in close proximity to the market.  GARCIA exited the vehicle and entered the market.

34.    At approximately 12:53 p.m., agents observed CW-1 exit the market and walk toward CW-1's vehicle.  Agents followed CW-1 back to a predetermined meet location, where CW-1 provided the bag he received from ROBLES to agents.  It contained 200 blue pills marked with the letter "M" on one side and "30" on the opposite side.  Based upon my training and experience, these pills are similar in appearance to oxycodone and are also consistent in appearance with the pills previously purchased from ROBLES that were examined by a DEA laboratory and found to contain fentanyl.

35.    Agents debriefed CW-1 regarding the controlled purchase.  According to CW-1, when he arrived at Albino's Market, ROBLES told CW-1 that he was waiting for his source to deliver the pills.  Soon after a Hispanic male (whom CW-1 recognized from prior purchases) entered the store and walked to the back of the business.  ROBLES also went to the back of the store and returned shortly thereafter and handed CW-1 the bag containing the pills.

36.     CW-1 informed the agents that he used the cell phone that DEA provided to take a video of the Hispanic male who met with ROBLES in the rear of the store. Agents viewed the video and identified the Hispanic male as GARCIA.

37.     Minutes after CW-1 exited Albino's Market, a surveillance agent observed GARCIA exit the market and re-enter the Prius.  Agents followed the Prius as it drove from Albino's Market and enter the Consumer Auto Parts parking lot located at 164 Shrewsbury Street in Worcester.  At approximately 1:07 p.m., surveillance observed FRANCO outside the vehicle.

C.     Augsust 5, 2019 Sale of Narcotics by GARCIA and FRANCO

38.     Throughout this investigation, agents have learned that Target Telephone 2 is used by both GARCIA and FRANCO.  On August 5, 2019, at approximately 12:07 p.m., agents intercepted a call to Target Telephone 2 from an unnamed female using a phone number ending in -1512 ("UF-1512").  FRANCO answered the call on Target Telephone 2 and directed UF-1512 to "Go to the Price Chopper."  The female caller asked, "On Greenwood Street?"  FRANCO responded, "Yeah."

39.     At approximately 12:19, FRANCO called UF-1512 and asked "How far?  Or how long, I mean?"  UF-1512 responded, "It says, the GPS says 17 minutes."  FRANCO told UF-1512, "Call me five minutes before you get there."  UF-1512 said, "I'll be in a black truck."

40.     At 12:29 p.m., UF-1512 called Target Telephone 2 and spoke with FRANCO again.  UF-1512  said, "The GPS says I'm six minutes away."  FRANCO then spoke to someone not on the call and asked, "Where do you want her to park in Price Chopper?"  GARCIA's voice could then be heard in the background.

10

41.     At 12:30 p.m., FRANCO called UF-1512 again and redirected UF-1512 to the 7-Eleven convenience store.

42.     At approximately 12:35 p.m. surveillance observed GARCIA back the Prius out of the driveway and depart the area of 8 Reeves St.  Agents subsequently observed GARCIA pulling the Prius into the parking lot of the 7-Eleven store located at 2 Blackstone River Road, Worcester.  At approximately 12:37 p.m., surveillance observed a black 2017 GMC Sierra pickup truck bearing Massachusetts registration RS84LM pull into the lot of the 7-Eleven store.

43.     Surveillance observed the female operator exit the truck, approach GARCIA's vehicle, and engage in what appeared to be a hand-to-hand transaction with GARCIA.  The parties then exited the 7-Eleven parking lot in their respective vehicles and traveled in the same direction on Blackstone River Road.  Agents conducting surveillance on the Prius followed GARCIA as he returned to his residence at 8 Reeves St.

44.     Agents followed the black GMC pickup truck as it pulled into a business parking lot at 149 Greenwood St.  Agents approached the truck and observed the female operator of the truck holding a plastic baggie in one hand and a hypodermic needle in the other.  At the agents' direction, the female dropped the drugs and needle and exited the vehicle.  A male passenger was also removed from the truck and was identified as the owner of the truck.  Agents seized two small baggies and a hypodermic needle from the truck.  The female described the substance as heroin and stated that she received it from "Animal."[8]

---

8  Agents conducted a "field test" of the substance that UF-1512 identified as heroin.  The field test was inconclusive.  Due to safety concerns, the bag was not opened in the field for further testing.  The alleged heroin was submitted for laboratory testing that is not yet complete.

45.     Agents have learned through the course of the investigation that GARCIA is known by the nickname "Animal," as he refers to himself in the August 3 call with TORRES detailed in paragraph 54.

C.   Evidence of efforts by GARCIA and FRANCO to distribute controlled substances to UF-1512

46.     On August 7, 2019 at approximately 8:13 p.m., GARCIA called UF-1512. During that conversation, UF-1512 told GARCIA that "the other stuff is better."  He asked her if she had checked "it" out, what I believe refers to a recent delivery of narcotics.  UF-1512 replied "it's okay, it's not better though.  It's not…it's not as good."

47.     At 8:36 p.m., FRANCO called UF-1512.  UF-1512 told FRANCO, "I was trying to tell him that this stuff is alright, but the other stuff is better."  I believe that UF-1512 was telling FRANCO that the quality of the most recent drugs was not as high as what she had received from FRANCO and GARCIA in the past.

48.     On August 8, 2019, at approximately 7:30 p.m., UF-1512 called Target Telephone 2 and spoke with FRANCO.  UF-1512 said she would be in Worcester in approximately 15 minutes and FRANCO asked her what quantity she wanted.  UF-1512 responded with "just 1," which I believe is a request for 1 bag of heroin.  Based on my training and experience of the sale of heroin in the Worcester area, I believe that "1 bag" is approximately .02-.04g.  UF-1512 asked FRANCO whether she had just "the new stuff or do you have the other."  FRANCO responded, "no, no…yeah the old."  In a separate call at approximately 7:54 p.m., FRANCO told UF-1512 to meet her at the 7-Eleven.  I believe that FRANCO was planning to meet UF-1512 to sell her additional narcotics.

49.     At approximately 8:00 p.m., FRANCO used phone number (774) 262-7827 to call GARCIA on Target Telephone 2.[9]  She told him that she was on her way to see UF-1512 at the 7-Eleven and believed that she had a flat tire.

50.     At approximately 8:42 p.m, FRANCO called UF-1512 from Target Telephone 2 and asked her "How you like that?"  I believe that FRANCO was asking UF-1512 if she liked the quality of the drugs that FRANCO had just delivered to her.

D.  August 10 conversations between ROBLES and GARCIA / ROBLES and FRANCO

51.     On August 10, 2019, ROBLES called GARCIA at approximately 10:42 a.m. to tell him that his "friend", which I believe refers to a fentanyl customer, needed "300 empanadillas" for a party."  He then reiterated "300" and said, "Today we make good money." GARCIA responded, "all set," which I believe was his agreement to supply the 300 pills to ROBLES to resell.

52.     Throughout this investigation, agents have intercepted multiple calls to GARCIA that reference him being late or having not shown up at all for an arranged meeting. On August 10, at approximately 12:37 p.m., a call was intercepted from ROBLES to Target Telephone 2, answered by FRANCO. Agents believe that ROBLES asked FRANCO to ensure that GARCIA, who he refers to as "the cousin," would be on time.  ROBLES told FRANCO that GARCIA was supposed to meet him at 2:00 that afternoon.  ROBLES told FRANCO that he needed more "pastelillos," referring to fentanyl pills.  "And another friend of mine who also throws parties, he just called me and he needed 100 more. So it's 400 I need…pastelillos."

---

[9] According to records from Eversource, natural gas service is provided to 8 Reeves St. Apt 3 to an account holder of "Cintia Franco" with a contact phone number of (774) 262-7827.

FRANCO responded that she couldn't guarantee it for him, and ROBLES told her to pour

water on GARCIA to wake him up.

53.     At 1:59, FRANCO called ROBLES from Target Telephone 2 and told him,

"Cousin, at 4:00."  ROBLES responded, "Uh, tell him to take it easy, that my friend left

already."  I believe that FRANCO called ROBLES to tell him that GARCIA would be late,

arriving at 4:00 instead of 2:00, with the pills.

E.  Δugust 3, 2019 (GARCIA and TORRES)

54.     On August 3, 2019, at approximately 2:02 p.m., GARCIA called TORRES at

(508) 353-5609. Based upon the following conversation, agents believe that TORRES told

GARCIA that he wanted to return drugs to GARCIA that TORRES's customers that did not

want. Agents believe that GARCIA told TORRES that he would acquire high quality drugs

that he would be able to provide to TORRES to sell.

> TORRES:     I'm going to arrive at the house in 20 minutes. The tall house[10],
> so that you can get the 10 that I told you are over here, and then there's around 7
> or 8 that are left over from the other stuff that no one wants.
>
> GARCIA:     Yeah, no, that's fine. I'm, I'm going to bring a great thing man.
> It's just that they haven't been able to go to the guy.  I already arranged to go get
> that.
>
> TORRES:     I don't know brother, because I'm hurtin' right now, my nigga.
> I've been f***d something bad.
>
> GARCIA:     You're f***d? I'm going to be the one to get you to shine, you'll
> see, when we get the stuff.
>
> TORRES:     Damn, so when…Anyways, we'll wait.

---

[10] The Worcester Police are familiar with TORRES and know him to be associated with address at 50
Franklin Street and 600 Main Street Worcester.  600 Main Street is a twenty-four story apartment
building, significantly taller than the surrounding buildings.

GARCIA:     No, that's all right, take it easy. Don't get desperate, love.  I'm
just reassuring you so your people aren't calling you. When I call you, I'll give
you something that, you'll see, you'll pay more than you expected. You'll be
like, "Animal, you're cold."

TORRES:     All right, it's all cold.

GARCIA:     I'll call you in a few minutes when I drop by there, all right?

TORRES:     All right man.

GARCIA:     All right.

55.     At approximately 2:39 p.m., surveillance agents observed GARCIA driving the

Prius away from the area of Alibino's Market.  At approximately 2:49 p.m., surveillance

observed TORRES leaving the area of 600 Main Street driving a 2004 black GMC Envoy,

bearing Florida registration 9479QM.  At approximately 3:00 p.m., surveillance observed

TORRES and GARCIA meeting in the area of 90-94 Main Street.

F.  AUGUST 7, 2019 (GARCIA AND JECTOR TORRES)

56.      On August 7, 2019, at approximately 11:35 a.m., TORRES called GARCIA.

GARCIA told TORRES, "I have for you…dude… I brought…a bunch of stuff…. I'm telling

you I have everything.  I'm going to swing by there to tell you what there is."  Investigators

believe GARCIA was referring to drugs that he had recently obtained.

57.     At 11:51 a.m., GARCIA received another call from TORRES.  GARCIA asked

TORRES where he was.  Torres responded with "Tacoma."

58.     At approximately 6:45 p.m., GARCIA called TORRES.  GARCIA asked

TORRES where he was located, and said that he was going to go to TORRES so that

TORRES could "check the thing."  GARCIA said, "You don't know the issue I have, because

they sent me something that supposedly was white and when I saw it, it wasn't like that…  I'm

going to go there so you can check it too." I believe that GARCIA wanted TORRES to check the quality of the drugs GARCIA's source of supply provided.

59.    At approximately 7:07 p.m., agents conducting surveillance saw GARCIA driving the Prius on Tacoma Street in Worcester, MA. He parked in front of 29 Great Brook Valley Avenue, a street that runs parallel to Tacoma Street. TORRES's 2004 GMC Envoy, bearing FL registration 9479QM, was parked in the lot.

60.    29 Great Brook Valley Avenue is a multi-unit apartment building. At approximately 7:08 p.m., agents saw GARCIA standing on the second floor landing.  At approximately 7:17 p.m., agents saw GARCIA exit apartment 3, a second floor unit that faces Tacoma Street. That apartment is leased to TORRES's girlfriend.

G.  AUGUST 8, 2019 (GARCIA AND JECTOR TORRES)

61.    On August 8, 2019 at approximately 1:12 p.m., GARCIA called TORRES. TORRES told GARCIA, "I checked the eight (8) pesos that you gave me right now.... it is mixed with morphine…That's not what we were looking for." Agents believe that TORRES is referring to checking pills that GARCIA had previously given to him and indicating that they contain morphine. Based on my training and experience, I am aware that counterfeit oxycodone pills have been made using morphine, which is not as potent, and therefore not as high quality, as counterfeit pills made of fentanyl. GARCIA told TORRES to return to him the pills that are bad so that he could address the problem with his supplier. GARCIA also told TORRES, "And also, you had to give me a couple of pesos from the other stuff…Do you remember the 18 that I sent to you with the woman?" TORRES responded, "Yes, that I owed you 400 pesos… And I gave you 600 pesos. And all of it was from the pills, because I've had

nothing [U/I]."  I believe TORRES meant that he had given GARCIA the money from the sale of pills.

H.  UNDERLINE AUGUST 11, 2019 (GARCIA AND TORRES)

62.     On August 11, 2019, TORRES called GARCIA at 7:01 p.m.  TORRES asked GARCIA "What's going on with those pills?...They're very soft. A bunch of them are broken." GARCIA responded, "Damn! Don't tell me that…I squeezed them too much without noticing. That was yesterday. Damn!"  TORRES replied, "What do you mean too much? They are very dark and they are very soft. But let me get home to check them out. I'll call you back."  I believe that TORRES was complaining about the quality of pills he had obtained from GARCIA.

63.     At approximately 8:53 p.m., GARCIA called TORRES and TORRES confirmed that the pills were bad. He said that "They were 80 wholes ones and 20 all broken up."  GARCIA responded by saying that he would have to check the rest that he had.

I.  August 17, 2019 (GARCIA and Jector TORRES)

64.     On August 17, at approximately 5:36 pm, GARCIA called TORRES.  Based upon the following conversation, agents believe that GARCIA asked TORRES to give him money that is owed to him. TORRES proceeded to tell GARCIA that he was on his way to the store, which agents believe was a reference to Albino's Market.  As detailed below, in my training and experience, I believe TORRES asked GARCIA about fentanyl pills and GARCIA responded that he could bring some to TORRES from a stash that he has at Albino's Market. TORRES told GARCIA that those pills are not of good quality.  GARCIA then told TORRES that he has to go and pick up more pills from his supplier and will contact his supplier regarding the quality of the pills. GARCIA tells TORRES that his supplier wanted him to go

to meet with him at 4:00, but that he was not able to go. Agents believe at the end of the conversation, TORRES tells GARCIA that he can meet up with him to give him money.

> TORRES: Talk to me, buddy.
>
> GARCIA: If you're going to give me something, throw it to me.
>
> TORRES: Where are you?
>
> GARCIA: No, I haven't stepped out. I'm hunkered down over here.
>
> TORRES: Huh? Hunkered down? You're with your woman?
>
> GARCIA: [Chuckles]
>
> TORRES: Look what I'm going to do…right now I'm on my way to the store.
>
> GARCIA: Over there?
>
> TORRES: Uh-huh
>
> GARCIA: To the store there?
>
> TORRES: Yes, and what happened to the pills? Nothing happened to the pills?
>
> GARCIA: No, if you want I can bring a couple from what I have there.
>
> TORRES: No, but those ones are not good.
>
> GARCIA: I don't know. I have ones over there that…but I have something original, new, like the ones before.
>
> TORRES: The [voices overlap]
>
> GARCIA: I have not gone to pick them up. I have to go. I had to be at my friend's at 4:00 today.
>
> TORRES: Dude. You're eating junk food. But come on, talk to me about the pills. Do you have good pills? From the last ones.
>
> GARCIA: I have…I think those ones are good, because…
>
> TORRES: No, no, no. Those ones are not good dude.
>
> GARCIA: I'm going to call Menor. I have. Chill out. Let me go over there.
>
> TORRES: To go where?
>
> GARCIA: I'll go there. To get the other ones. You gave me a complaint and then I gave him a complaint.
>
> TORRES: Yes, quick.
>
> GARCIA: They told me to go today at 4:00 and you know, I'm stuck.
>
> TORRES: Ay, ay, ay.

GARCIA: I'm stuck. Because you know I told you to give me something too.

TORRES: Ay! That's a lie.

GARCIA: That's true, that's true.

TORRES: All right, so, I'm going to call you when I'm around there so you can pass by and pick up something.

GARCIA: All right, go ahead.

TORRES: Okay

J.   AUGUST 23, 2019 (TORRES AND GARCIA)

65.    On August 23, 2019 at 10:01 a.m., GARCIA sent a text message to TORRES that read, "I need the money."  Based upon the investigation to date, agents believe that TORRES owed money to GARCIA for the purchase of pills.

66.    On September 15, 2019, TORRES contacted GARCIA at approximately 1:30 p.m. and asked GARCIA to prepare "20 bucks of the round one."  He said that he would text GARCIA an address and sent "215 Grove Street Worcester," which is the location of "Ernie's Car Wash."

67.    TORRES said that he would text GARCIA an address and sent "215 Grove Street Worcester," which is the location of "Ernie's Car Wash."  GARCIA warned TORRES to be careful because "car washes are hot," which I believe to be GARCIA's way of cautioning TORRES that the police may be observing the car wash.  GARCIA told TORRES to meet him at the Walmart instead.

68.    On September 16, at approximately 12:38 p.m., GARCIA called TORRES and an unknown woman answered.  GARCIA identified himself as "Animal" and then spoke with TORRES.  GARCIA asked TORRES for "something," which I believe to be money, and

TORRES said that he was at the Registry [of Motor Vehicles] and would check when he got to the house.

69.     At approximately 7:35 p.m., GARCIA called TORRES again.  TORRES told him that there were "300 pesos." GARCIA responded by saying "Damn! I can't complete the 700 pesos for tomorrow."  TORRES then said, "Well it depends on what comes out."   I believe that TORRES owed money to GARCIA, and that his ability to sell additional narcotics would determine how much money he could give to GARCIA.

70.     On September 17, 2019 at approximately 2:26 pm., TORRES called GARCIA. GARCIA told TORRES to give him "whatever you have." TORRES responded, "yeah, but that's all right but…how do I say it?  Um…come over here.  But…I need round ones.  I believe that TORRES was requesting additional pills from GARCIA.

71.     TORRES told GARCIA to meet him "at my woman's place.  At Tacoma." Based on the investigation to date, I understand that to mean 29 Great Brook Valley, Apartment #3, the apartment that GARCIA visited on August 7, as described in paragraphs 59-60.

72.     On September 22, at approximately 4:49 p.m., TORRES called GARCIA and asked him to "prepare all for me and I'll be in Worcester in about 5 minutes."  TORRES then texted "15 fairbank st" to GARCIA and told GARCIA to meet him at his "aunt's house."  At 5:20 p.m, GARCIA called TORRES and asked, "No round ones?" to which TORRES responded, "Yes, yes, that's why I said all."  At 5:39 p.m, FRANCO called TORRES from Target Telephone 2 and told him to "Come out."   I believe that TORRES ordered additional narcotics from GARCIA, and that FRANCO had control of Target Telephone 2 so instructed TORRES when to go outside to meet GARCIA as he delivered the narcotics to TORRES.

## CONCLUSION

73.     Based on the foregoing, I submit that there is probable cause to believe that

Antonio Amauris Rosario GARCIA a/k/a "Animal" (born 1982), John ROBLES (born 1965),

Jector TORRES (born 1989) and Cintia FRANCO (bon 1989) have committed the Subject

Offense, to wit: conspiracy to possess with intent to distribute and to distribute fentanyl, in

violation of 21 U.S.C. § 846.

WHEREFORE, your affiant respectfully requests that the Court issue the requested

criminal complaints and arrest warrants.


_____
David M. DiTullio
Special Agent
Drug Enforcement Administration


Subscribed and sworn to me this _____1st_____day of October 2019.



_____
DAVID H. HENNESSY
United States Chief Magistrate Judge
District of Massachusetts

-